**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| INTUMESCENT TECHNOLOGIES, LLC, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | |
| SDG, LLC, an Arizona limited liability company, FIRESTOP, LLC, an Arizona limited liability company, JEFFREY H. COHEN, a citizen of Arizona, and JON COHEN, a citizen of Colorado, | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT

As and for its Complaint in the instant matter, Intumescent Technologies, LLC shows the Court as follows:

## PARTIES AND OTHER PERSONS RELATED TO THESE PROCEEDINGS

1.     Intumescent Technologies, LLC ("ITL") is an Atlanta, Georgia-based company formed to bring to market patented fire prevention, fire suppression, and building materials technologies.

1

2. PyroPhobic Systems Ltd. ("Pyro") is a material science company with unique, proprietary intumescent technologies. Pyro is based in Barrie, Ontario, Canada.

3. SDG, LLC ("SDG") is a fire protection engineering and design firm based in Tucson, Arizona. It may be served by effecting service of process upon its registered agent, Steven Scandaliato, at the company's offices located at 1330 W. Roller Coaster Road, Tucson, AZ 85704.

4. Firestop, LLC ("Firestop") is a company which provides passive firestop solutions via technical expertise or product specification and procurement. It may be served by effecting service of process upon its registered agent Monica Richards or its managing partner Jeffrey H. Cohen, at the company's offices located at 15783 Primrose Dr., Fountain Hills, AZ 85268. Firestop has in the past acted as a Monsair-authorized reseller of the FireBlok Fire Suppression Gaskets of ITL.

5. Jeffrey H. Cohen ("Jeff Cohen") is a citizen of Arizona, residing at 15783 Primrose Dr., Fountain Hills, AZ 85268. He may be served by effecting service of process at this address.

6. Monsair Technologies, LLC ("Monsair") is a company focused on delivering fire prevention, fire suppression and innovation based

2

technologies to the construction marketplace.  In 2011, 2012 and 2013, Monsair marketed and sold ITL firestop protection products pursuant to an ITL-Monsair Dealer-Reseller agreement.

7.    Jon Cohen ("Jon Cohen") is a citizen of Colorado.  He has at all relevant times served as the President of Monsair.  He may be served by effecting personal service upon him at his office at 2010 W 120th Ave. Suite 104. Denver CO 80234.

## STATEMENT OF JURISDICTION AND VENUE

8.    For reasons shown herein, SDG, Firestop, Jeff Cohen, Monsair and Jon Cohen have each transacted business within Fulton County, Georgia, and the causes of action complained of herein arise from the transaction of said business in Fulton County.

9.    In addition, as shown herein, SDG, Firestop, Jeff Cohen, and Jon Cohen have each committed a tortious injury in this state and in this judicial district caused by an act or omission outside this state.  Upon information and belief, SDG, Firestop, Jeff Cohen, and Jon Cohen regularly do and regularly solicit business, in this state.  Upon information and belief, SDG and Firestop also regularly engage in other persistent courses of conduct and/or derive

substantial revenue from goods used or consumed or services rendered in this state.

10. Venue in this Court is proper because a substantial part of the events or omissions giving rise to ITL's claims, as well as ITL's injuries, occurred in Fulton County.

11. This is an action in diversity between citizens of different states, where the value of the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. "In a diversity actions, venue is proper in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(a)(2).

## JOINT VENTURE FORMATION AND PURSUIT OF THE SUNCOR OIL SANDS PROJECT

13. On or before September 2011, Suncor, which owns and/or leases oil sand mines in Alberta, Canada (the "Suncor oil sand mines"), hired Worley-Parsons as the general contractor to make the mines operable.

14. On or about September 2011, Worley-Parsons awarded SDG, LLC a passive and active fire stop protection project to support the build out of an oil sands mine in Alberta, Canada.

4

15. Since September 2011, upon information and belief, Steven Scandaliato and Jeff Cohen have at all relevant times been equity partners in Firestop LLC.

16. On or about December of 2011, Monsair, through its President Jon Cohen, called ITL on behalf of Firestop to discuss a fire-stopping solution leveraging the intellectual property of PyroPhobic ("Pyro"). Jon Cohen explained to ITL that his company Monsair would not be involved in the transaction, that it would be a separate arrangement between Firestop, SDG, ITL and Pyro.

17. On April 20, 2012, Firestop, SDG, ITL and Pyro entered into a non-disclosure agreement and initiated their joint pursuit of the fire stop protection project for the Suncor oil sand mines. Accordingly, the parties began due diligence efforts.

18. As Firestop, SDG, ITL and Pyro conducted negotiations of terms and conditions of a nondisclosure agreement, the parties were each discussing proposed terms of their business relationship as it pertained to the joint pursuit of the Suncor oil sands project. These negotiations included one or more important terms such as product line(s), compensation, pricing, promotion/marketing of their expertise, warranty, and diligence work. These discussions and negotiations were done largely by email, facsimile,

telephone and mail, and included numerous, purposeful email, facsimile, telephone and mail transmissions by all parties to ITL at its offices in Atlanta, Georgia.

19. A focal point of project due diligence related to the potential use of a wrap-based solution using Pyro's Bernograph technology.

20. In May 2012, Worley Parsons' corrosion control engineers advised SDG that wrap-based solutions would not likely work due to rust and corrosion concerns. In response, SDG asked Pyro to investigate spray-on solutions. After this occurred, Pyro National Sales Manager, Tim Riley, suggested to ITL and Pyro a third party spray-on insulation solution. Pyro and ITL informed SDG of this and SDG requested that they pursue the third party solution with all due speed.

21. In May of 2012, SDG, Firestop, ITL and Pyro had discussions relating to the pursuit of the Suncor oil sand mines project and how revenues would be paid out on the Suncor oil sand mines project. A consensus was reached that Firestop and SDG would take 33.3% of the project profits, ITL would take 33.3% of the project profits and Pyro would take 33.3% of the project profits. The parties continued to pursue the project on the basis of this consensus. These discussions and negotiations were done largely by email,

facsimile, telephone and mail, and included numerous, purposeful email, facsimile, telephone and mail transmissions by all parties to ITL at its offices in Atlanta, Georgia.

22. In July of 2012, ITL mentioned the aforesaid agreement relating to splitting up revenues relating to the Suncor oil sand mines project to Jon Cohen. Mr. Cohen – a sitting member of the ITL board of directors – objected to the joint venture and related profit splitting, and stated that, if pursued, the Commission Agreement was a "deal killer" for the entire ITL-Monsair contractual relationship. ITL referenced previous occasions when Mr. Cohen had said the Suncor oil sands project was between SDG, Firestop, ITL and Pyro.

23. Jon Cohen advised ITL and Firestop, and perhaps others, that the Commission Agreement would need to be renegotiated so that Monsair could participate in the profits. Firestop, which is run by Jon Cohen's brother Jeff Cohen, agreed with Jon Cohen and expressed a desire to renegotiate the terms of the joint venture.

24. By July of 2012, Tim Riley was actively involved in regular conference calls demonstrating critical subject matter expertise on passive fire stop protection beyond SDG's capabilities.

25. Between July of 2012 and September 2012, Pyro invested substantial time and money to secure the rights to the spray-on technology from a third-party company for the benefit of SDG, Firestop, ITL, and Pyro.

26. On October 26, 2012, Pyro signed a Commission Agreement with AI to secure rights to its solution.

27. Pyro and ITL then revealed to SDG and Firestop the identity of AI and the aforesaid AI-Pyro agreement. All parties to the joint venture stood to benefit from Pyro's commissions under the terms of the joint venture.

28. The Pyro-AI agreement set forth a 4% commission to be paid to Pyro.

29. Starting at about November 12, 2012 and continuing for a month, a series of conference calls were held involving representatives of Pyro, ITL, AI, and SDG to prepare for a meeting at Worley-Parsons in Calgary for the express purpose of proposing the AI solution. Jeff Cohen of Firestop participated in some but not all of these calls. These discussions were done largely by fax, email and telephone, and included numerous, purposeful email and telephone transmissions by all parties to ITL at its offices in Atlanta, Georgia.

30. On or about December 12, 2012, the joint venturers presented AI's proposed firestop solution to key Worley-Parsons and Suncor decision makers in

Calgary.  At the meeting, several Suncor representatives positively commented on their past experience with AI solutions on offshore oil platforms.

31. On a conference call organized by ITL on or about January 10, 2013, Jon Cohen verbally agreed to an even split of 1/3-1/3-1/3 (Pyro 33.3%, ITL 33.3%, Firestop/SDG/Monsair 33.3%) on the revenues paid to the joint venture by AI, with all entities sharing hard costs equally.  These discussions were done largely by email and telephone, and included numerous, purposeful fax, email and telephone transmissions by all parties to ITL at its offices in Atlanta, Georgia.

32. Jon Cohen informed ITL and Pyro that Firestop lacked the money to fund any hard costs, so Monsair would participate in Firestop's share of revenues and would cover Firestop's share of the costs.  All parties agree to amend the terms of the joint venture to pursue the Suncor oil sands project accordingly.

## SDG AND FIRESTOP STEAL THE OBJECT OF THE JOINT VENTURE

33. In November 2012, without advising ITL or Pyro, Firestop and SDG commenced investigating AI's competitors.  Firestop and SDG believed that if a competitive solution could be found to that of AI, they could cut ITL and Pyro out of the joint venture entirely.

9

34. Without alerting ITL or Pyro, Jeff Cohen and Jon Cohen identified International Paint as an AI competitor in November or December of 2012. Jeff Cohen then negotiated a Commission Agreement with International Paint on behalf of Firestop and Monsair so that International Paint could be presented as a viable solution for use in the Suncor oil sands project.

35. During the course of the parties' business dealings in this same time frame, Firestop and SDG made material and fraudulent misrepresentations to ITL in this judicial district concerning the status of the project, AI's chances of success, all the while concealing their efforts to undermine the joint venture's efforts so they could cut ITL and Pyro out of the deal. Upon information and belief, these misrepresentations and concealments were made with knowledge of their falsity and with knowledge of the fact that they would be injurious to ITL's business, which was at all times located in Georgia within this judicial district.

36. On or about January 15, 2013, Jon Cohen called ITL and backed out of the agreement reached on January 10, explaining that he thought about it over the weekend and stating that Monsair could not afford to invest in something outside of its "core competency" (gaskets sales).

37. Upon information and belief, between January 10, 2013 and January 15, 2013, Jeff Cohen advised Jon Cohen that Firestop and SDG had identified International Paint as an alternative to AI and intended to pursue the object of the joint venture with this solution – and without ITL and Pyro.

38. In or about February 2013, SDG persuaded Worley-Parsons not to pursue any type of solution offered by AI.  Pyro attempted to persuade Worley-Parsons to reconsider the use of AI for the solution.  When these efforts proved unsuccessful, and believing the object of the joint venture to have been frustrated as it pertained to the AI solution, Pyro and AI terminated the contract with each other on or about February 12, 2013.

39. On or about February 21, 2013, Jon Cohen learned from ITL that Pyro no longer had AI under contract for the Suncor oil sands project.

40. On or about March 4, 2013, Pyro – still believing the object of the joint venture to be unobtainable with an AI solution – terminated its nondisclosure agreement with SDG.

41. On or about March 4, 2013, Jeff Cohen called Brian Mallon of ITL and confessed that Firestop and SDG started looking at AI's competitors in November-December 2012 for the purposes of cutting ITL and Pyro out of the pursuit of the Suncor oil sands project.  Mr. Cohen further admitted to

11

Mr. Mallon that Firestop and SDG decided to pursue International Paint as an alternative to AI, and that on February 1, 2013, Firestop executed a commission agreement with International Paint and, together with SDG, commenced the process of blackballing AI at Worley-Parsons.

42. Subsequent to this call, and after letting it be known to AI that it had been blackballed from consideration by Worley-Parsons, Jeff Cohen advised one or more representatives of AI that Firestop could get AI back into consideration with Worley-Parsons as a solution for the Suncor oil sands project. However, Mr. Cohen made it clear to AI that Firestop would only do so if AI entered into an agreement with Firestop that had the same payment and commission terms that were part of the earlier agreement between Pyro and AI.

43. AI agreed to enter into an agreement with Firestop shortly after receiving Jeff Cohen's proposal. Upon information and belief, the payment and commission terms of that agreement are substantially similar to those of the earlier Pyro-AI agreement.

44. The Suncor oil sands project was awarded to AI via Firestop and SDG (the "Award").

12

45. Firestop and SDG by their words and actions have repudiated the joint venture, and have cut out their joint venture partners Pyro and ITL from participating in the profits of the joint venture.  To date, neither Firestop nor SDG has given Pyro or ITL an accounting of sales and profits relating to the award of the Suncor oil sands project.

## COUNT I – BREACH OF FIDUCIARY DUTY (FIRESTOP AND SDG)

46. Plaintiff restates and incorporates the provisions of paragraphs 1-45 of the Complaint as if set forth in their entirety herein.

47. As joint venturers, Firestop and SDG owed ITL and Pyro fiduciary duties of loyalty and good faith.

48. Firestop and SDG violated these duties by conspiring to cut ITL and Pyro out of the Suncor oil sands project and taking active steps to effect said conspiracy.  These breaches include (a) researching competitive solutions to those of AI; (b) negotiating with International Paint; (c) actively dissuading decision makers from the AI solution being advocated by the joint venture, in order to delay an award of the project; (d) leading Pyro and ITL to believe that AI had been blackballed from the project; (e) furtively negotiating a new deal with AI on terms comparable to those previously negotiated with

AI by Pyro; (f) actively pursuing the award with the new Firestop-AI agreement; and (g) actively concealing this information from ITL or Pyro.

49. As a result of Firestop's breach of fiduciary duty, ITL is owed an accounting of all sales activities, sales made, invoices generated, product distributed, costs incurred, costs paid, product delivered, past and present inventory of AI or other products to be sold in connection with the Suncor oil sands project, and monies received by Firestop and its agents which relate in any way to the sales, marketing or distribution of any product or service to the Suncor oil sands project, regardless of name.

50. As a result of SDG's breach of fiduciary duty, ITL is owed an accounting of all sales activities, sales made, invoices generated, product distributed, costs incurred, costs paid, product delivered, past and present inventory of AI or other products to be sold in connection with the Suncor oil sands project, and monies received by SDG and its agents which relate in any way to the sales, marketing or distribution of any product or service to the Suncor oil sands project, regardless of name.

51. As a further result of the foregoing breaches of fiduciary duty, Firestop and SDG are jointly and severally liable to ITL for actual damages in an amount to be proven at trial.

## COUNT II – BREACH OF FIDUCIARY DUTY (JON COHEN)

52. Plaintiff restates and incorporates the provisions of paragraphs 1-51 of the Complaint as if set forth in their entirety herein.

53. Jon Cohen owed ITL fiduciary duties because he was a director of ITL.

54. Jon Cohen allowed his relationship with Monsair and his relationship with his brother to compromise his fiduciary duties owed to ITL. Specifically, Jon Cohen inappropriately slowed down the joint venture by objecting to it for Monsair and threatening ITL with adverse consequences unless the joint venture group cut Monsair into the deal.

55. Jon Cohen further breached his fiduciary duties by helping Firestop and Jeff Cohen find competitors to AI, including International Paint, in an effort to prevent the joint venture from successfully closing a deal on the Suncor oil sands project using the AI solution which was at one time contractually obligated to Pyro as representative of the joint venture.

56. Jon Cohen further breached his fiduciary duties by announcing on or about January 15, 2013 that Monsair was not going to cover Firestop's expenses of the venture.

57. As a result of the foregoing breaches of fiduciary duty, Jon Cohen is liable to ITL for actual damages in an amount to be proven at trial.

15

## COUNT III – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AND PROSPECTIVE BUSINESS ADVANTAGES (FIRESTOP AND SDG)

58. Plaintiff restates and incorporates the provisions of paragraphs 1-57 of the Complaint as if set forth in their entirety herein.

59. ITL and Pyro possessed a vested contractual interest in the Pyro contract with AI and in the advantages that said contract offered their joint venture pursuit of the Suncor oil sands project.

60. Firestop and SDG conspired to interfere with these contracts and economic advantages, and did interfere with them improperly and without privilege.

61. Firestop and SDG acted maliciously and with the intent to injure ITL and Pyro.

62. SDG, acting in furtherance of its conspiracy with Firestop, actively impeded the efforts of the joint venture to promote AI as a solution for the Suncor oil sands project.

63. This in turn caused joint venture partners ITL and Pyro financial harm. As a result, SDG and Firestop are jointly and severally liable to ITL for actual damages in an amount to be proven at trial.

## COUNT IV – DECLARATORY JUDGMENT OF JOINT VENTURE AND ACCOUNTING

64. Plaintiff restates and incorporates the provisions of paragraphs 1-63 of the Complaint as if set forth in their entirety herein.

65. The actions of Firestop and SDG have created insecurity on the part of ITL with respect to the existence or nonexistence of ITL's right to participate as a partner in the profits associated with the Award. ITL seeks a declaration that the joint venture which it formed along with SDG, Firestop and Pyro was never lawfully dissolved because the object of the joint venture was attainable and was in fact attained by SDG and Firestop using a solution which was contemplated originally by the joint venture. Any rights, powers, and privileges of SDG and Firestop (as well as any of their assigns or successors-in-interest) obtained pursuant to the Award are therefore rights, powers and privileges to which ITL is entitled.

66. ITL seeks a judicial declaration of its status as a joint venture partner in connection with the Award.

67. As part of its rights as a joint venture partner, ITL seeks an accounting of the profits related to the Award, and it further seeks an order awarding it entitled to its share of said profits in accordance with the terms of the joint venture to which the parties agreed.

68.  A justiciable controversy exists with respect to whether there is a joint venture and, what the terms of said joint venture are.  A declaratory judgment of the nature sought herein will terminate the pending controversy and adjust the rights of the parties accordingly, thus eliminating the present uncertainty suffered by ITL.

69.  ITL therefore prays that the Court declare the rights and other legal relations of ITL with respect to SDG and Firestop (and their successors and assigns) as it pertains to the joint venture and a share of the profits arising from the Award.

## COUNT V – AWARD OF LITIGATION EXPENSES AND FEES

70.  Plaintiff restates and incorporates the provisions of paragraphs 1-69 of the Complaint as if set forth in their entirety herein.

71.  These Defendants have each acted in bad faith, have been stubbornly litigious, and have caused ITL unnecessary trouble and expense.  As such, ITL respectfully requests that the Court award ITL its expenses of this litigation, including attorney's fees, pursuant to O.C.G.A. § 13-6-11.

## COUNT VI – PUNITIVE DAMAGES

72.   Plaintiff restates and incorporates the provisions of paragraphs 1-71 of the Complaint as if set forth in their entirety herein.

73.   The breaches of fiduciary duty and tortious interference complained of herein on the part of the Defendants demonstrate the each of the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.  Therefore, punitive damages should be awarded against the Defendants solely to punish, penalize, or deter these actions from ever occurring again.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a jury on all issues so triable.

## PRAYER FOR RELIEF

**Wherefore**, Plaintiff ITL respectfully requests that the Court, upon jury trial, award ITL actual and punitive damages against the defendants in an amount to be proven at trial, as well as its expenses of litigation, including reasonable attorney's fees, and that the Court further declare the existence of the joint venture as described herein, require the Defendants to provide an accounting to Plaintiff, and impose a duty upon defendants SDG and Firestop, as well as all of their agents

and successors, to share profits on a fair and just basis with ITL.  Plaintiff further requests that the Court award Plaintiff interest on all amounts awarded herein. Plaintiff further requests that the Court award such other relief as the demands of justice may require.

This 11th day of December, 2013.

Respectfully submitted,

By:   /s/ Steven G. Hill
       Steven G. Hill
       Georgia Bar No. 354658
       Jennifer Calvert
       Georgia Bar No. 587191
       Julie Burke
       Georgia Bar No. 448095
       **HILL, KERTSCHER &
       WHARTON, LLP**
       3350 Riverwood Parkway, Suite 800
       Atlanta, Georgia 30339
       Tel: (770) 953-0995
       Fax: (770) 953-1358
       E-mail: sgh@hkw-law.com
               jc@hkw-law.com
               jb@hkw-law.com

*Attorneys for Plaintiff*

20

## CERTIFICATE UNDER L.R. 7.1.D

Pursuant to Northern District of Georgia Local Rule 7.1.D, the undersigned counsel for Plaintiff hereby certifies that the above and foregoing pleading is a computer documents prepared in Times New Roman (14 point) font in accordance with Local Rule 5.1.B.

So certified this 11th day of December, 2013.

Respectfully submitted,

By:   /s/ Steven G. Hill
      Steven G. Hill
      Georgia Bar No. 354658
      **HILL, KERTSCHER & WHARTON, LLP**
      3350 Riverwood Parkway, Suite 800
      Atlanta, Georgia 30339
      Tel: (770) 953-0995
      Fax: (770) 953-1358
      E-mail: sgh@hkw-law.com

      *Attorneys for Plaintiff*